# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

JAMES HENDERSON, JR.,       )
         Plaintiff,         )
                           )
      v.                   )     Cause No.: 2:13-cv-14-PRC
                           )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,   )
         Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint for Judicial Review [DE 1], filed by Plaintiff James Henderson, Jr., on January 9, 2013, and Plaintiff's Social Security Opening Brief [DE 17], filed on July 25, 2013. Henderson challenges the September 2, 2011 decision of the Administrative Law Judge (ALJ) that he is not disabled under the Social Security Act.

### I. Background

The Court forgoes a detailed recitation of Henderson's medical background. Those looking for a comprehensive discussion of Henderson's medical records are directed to the extensive summaries found in the ALJ's decision (AR 23–32), Henderson's opening brief [DE 17], and the Commissioner's Response [DE 23]. Rather than reiterating those summaries, the Court gives a brief overview of Henderson's history of health issues and how the proceedings have unfolded thus far.

Henderson was born on December 31, 1948, and was fifty-three years old on the date he alleges his disability began. He worked as a pulpit attendant at a steel mill from 1967 until his last day of work on February 11, 2002. His chief medical complaints are multiple sclerosis, bone spurs, difficulty walking, and loss of balance.

Henderson filed an application for Disability Insurance Benefits (DIB) on January 12, 2010, alleging that he was disabled beginning on his last day of work, February 11, 2002. Henderson's

date last insured (i.e., the date by which his disability must have commenced in order to receive benefits) was June 30, 2007.

After his applications were denied initially and upon reconsideration, Henderson appeared with his lawyer and testified at a video hearing before ALJ Curt Marceille. Vocational Expert Cheryl Hoiseth provided vocational testimony at the ALJ's request.

The ALJ issued a written decision on September 2, 2011, denying benefits. The Appeals Council denied Henderson's subsequent request for review, making the ALJ's denial the Commissioner's final decision. 20 C.F.R. §§ 404.955; 404.981.

Henderson then sought Judicial Review on January 9, 2013. The Administrative Record was filed on March 13, 2013, and the matter became fully briefed on October 16, 2013. The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

### A. Medical Background from Before the Date Last Insured

The records from before the last date that Henderson was insured reveal that he suffered from a number of back and nerve problems, resulting in persistent numbness in his hands and, increasingly, from the waist down. He had carpal tunnel syndrome in his right wrist, possibly related to chronic polyneuropathy, myelopathy, and radiculopathy. Doctors suspected he might have a syrinx (a fluid-filled cyst within the spinal cord) in his cervical spine. A brain MRI revealed mild atrophy and periventricular white matter changes, mainly in the right occipital lobe.

Drug treatment failed to make much difference. For one, he was allergic to steroids. Lyrica apparently did nothing to help. And he also took his medications inconsistently. Though he

complained often of numbness and tightness in his legs, Henderson denied that he had difficulty walking. The doctors concluded that he suffered from mild myelopathy, dymylenization, and possibly from multiple sclerosis. He also was diagnosed with mild spondylosis, facet osteoarthritis, degenerative disc disease, narrow lumbrosacral joint space, and various arthritic changes in his back. None of the doctors recommended surgery, though neurosurgeon Dr. Kaakaji did suggest that a spinal tap of the syrinx might be helpful.

### B. Medical Background from After the Date Last Insured

There was a three-year gap in medical treatment from November 2006 to December 2009. When Henderson again sought treatment, his condition had significantly worsened. His back was now afflicted with a number of degenerative changes throughout (e.g., bulging discs, herniated disc, etc.), causing nerve signal deterioration. One study revealed that he suffered from myelitis. His brainstem was also sending abnormal signals. His gate was clumsy, and he lost balance at times. He was prescribed physical therapy and a cane to help him with walking. (He testified at the hearing that has never taken to using the cane because he is stubborn and because, where he lives in Gary, Indiana, walking with a cane might make him a more conspicuous target for street violence.) His muscles were also weaker. Dr. Kaakaji recommended surgery to relieve spinal cord compression but noted that it would be difficult to predict if the surgery would alleviate his symptoms. By 2010, the doctors were agreed that Henderson very probably had multiple sclerosis.

Henderson's treating physician, neurologist Dr. Abu-Aita, advised the City of Gary that Henderson needed a designated handicapped parking space in front of his house because of his myelopathy, weakness, unsteady gate, and multiple sclerosis. In August 2010, Dr. Abu-Aita filled out a multiple sclerosis RFC questionnaire. In his answers, Dr. Abu-Aita explained that Henderson

had severe impairments as a result of his multiple sclerosis. For example, Dr. Abu-Aita noted that Henderson could sit or stand/walk for only about an hour per day in ten-minute increments. And he noted that Henderson needed frequent unscheduled breaks and that he would miss work about four times per month because of his impairments.

At the hearing, Henderson testified that he has enormous difficulty walking and that he can barely drive. He also testified that his ailments were much the same before the date last insured, albeit somewhat reduced in severity.

## C. The ALJ's Decision

The ALJ made the following findings in the sequential five-step evaluation. At step one, he found that Henderson had not engaged in any substantial gainful activity at any relevant time. At step two, he found that Henderson suffered from the following severe impairments: "degenerative changes of the lumbar, thoracic, and cervical spine and cervical disc bulging without stenosis and mild myelopathy." (AR 25). He found that Henderson's diabetes mellitus, hypertension, and mycosis fungoides (a type of non-Hodgkins lymphoma) were non-severe impairments. The ALJ did not determine whether Henderson's multiple sclerosis was a severe impairment, noting that it was diagnosed thirty months after the date last insured.[1]

Next, the ALJ found that none of Henderson's impairments alone or in combination met or equaled the criteria for listed impairment in Appendix 1, Subpart P of 20 C.F.R. § 404. The ALJ determined that Henderson had the residual functional capacity (RFC) for light work, except that he could frequently use his hands for both gross and fine manipulations.

---

[1] The ALJ's decision also states that "Even if [multiple sclerosis] is considered a medically determinable impairment during the insured period, the claimant did not receive any treatment for multiple sclerosis and complained of no functional restrictions." (AR 26).

The ALJ found that Henderson's testimony was not credible to the extent that it was inconsistent with the RFC because, though "the medically determinable impairments could reasonably be expected to cause the alleged symptoms," Henderson's claims about the "intensity, persistence and limiting effects of these symptoms" did not align with the medical evidence. (AR 28). At step four, the ALJ found that Henderson was able to perform his past relevant work "as generally performed and possibly as actually performed" as of the date last insured. (AR 31). The ALJ found that Henderson's work as a pulpit attendant/work order detailer was properly classified under the Dictionary of Occupational Titles as order clerk (DOT # 221.387-046). The ALJ did not make an alternative step five finding.

## II. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the

question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734–35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

### III. Disability Standard

To be eligible for disability benefits, a claimant must establish that he suffers from a

"disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual

functional capacity (RFC). The RFC "is an administrative assessment of what work-related activities

an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th

Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676

(7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps

one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also*

*Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

### IV. Analysis

Henderson marshals two arguments for why the ALJ's decision should be reversed or

remanded. First, he argues that the ALJ wrongly rejected the opinion of treating neurologist Dr.

Abu-Aita. Second, he contends that the ALJ erroneously found Henderson not credible. The Court

considers each in turn.

### A. Multiple Sclerosis and Dr. Abu-Aita's 2010 Opinion

Henderson's treating neurologist, Dr. Abu-Aita, filled out a Multiple Sclerosis RFC

questionnaire on August 25, 2010 (more than three years after the date last insured). Though the

opinion describes Henderson's condition at the time Dr. Abu-Aita filled out the questionnaire, the

opinion adds that both the symptoms and limitations had been present since August 2006.[2]

The ALJ gave this opinion little weight in reference to the insured period because he found

that Dr. Abu-Aita's opinion in the questionnaire was inconsistent with evidence from the insured

---

[2] In answer to the question of "What is the earliest date that the description of symptoms *and limitations* in this questionnaire applies," Dr. Abu-Aita wrote: "since first consult 8/06—symptoms just got worse." (AR 479). Of course the symptoms and restrictions in 2006 cannot be both the *same as* and *worse than* the symptoms and restrictions in 2010. And the ALJ apparently read the opinion to say that the limitations and symptoms were largely the same in 2006 as in 2010.

period (including earlier records by Dr. Abu-Aita). This evidence, the ALJ found, supported the claims of numbness but not of the low functioning capacity described by Dr. Abu-Aita in his 2010 opinion. The ALJ accordingly did not include multiple sclerosis as an impairment, stating that it was diagnosed more than thirty months after Henderson's insurance lapsed and that, even if considered as an impairment, evidence from the insured period did not reveal that it posed any restrictions.

*1. The Evidence from the Insured Period*

Henderson's first objection is that the medical records from the insured period support a diagnosis of demyelination disease, specifically: multiple sclerosis. Henderson complained of leg numbness and leg cramps as early as 2001 and 2003 respectively. But imaging studies done at the time revealed only arthritic changes and no neurological issues. In 2006, however, he complained of numbness of the hands and from the waist down. This time, treating physician Dr. Zabaneh diagnosed Henderson with neuropathy and referred him to Dr. Abu-Aita, who noted that Henderson's neurological evaluation was normal overall, but that he had decreased sensation of vibration in his right foot. Follow-up testing led to a diagnosis of carpal tunnel syndrome in Henderson's right wrist. Dr. Abu-Aita noted that there was no active polyneuropathy, myelopathy, or radiculopathy, but qualified this by explaining that there might be *chronic* polyneuropathy, myelopathy, or radiculopathy.[3] Dr. Abu-Aita also diagnosed Henderson with a syrinx in the cervical spinal chord and mild brain atrophy. Shortly thereafter, Henderson saw neurosurgeon Dr. Kaakaji, who noted that Henderson appeared to have mild myelopathy and demyelination disease.

None of this, however, makes much difference for Henderson's case since the ALJ considered mild myelopathy as a severe impairment and stated that, even if Henderson was, in fact,

---

[3] Henderson nowhere explains the medical significance of this distinction.

suffering from multiple sclerosis during the insured period, he had not shown that there were any functional limitations as a result. In any event, Henderson merely establishes that he was treated for numbness and leg cramps and that he was diagnosed with a handful of related neurological problems with mild symptoms. This treatment alone does not establish disability. *See Placke v. Colvin*, 4:12-CV-87-RLY-TAB, 2013 WL 5303746 (S.D. Ind. Sept. 19, 2013) ("Despite Placke's long treatment history for fibromyalgia, which was extensively discussed by the ALJ . . ., her argument is unavailing because substantial evidence supported the ALJ's RFC determination."). Henderson's argument on this point accordingly fails.

### 2. Gap in Treatment

Henderson next presents reasons why the gap in treatment from 2006 to 2009 is of no consequence, arguing that treatment would not have improved his condition. Though he claims that the treatment gap was one of the reasons why the ALJ discounted Dr. Abu-Aita's 2010 assessment, the cited portions of the ALJ's decision do not support this. While the gap was important in the ALJ's reasoning, it is mentioned to highlight that the impairments Henderson later manifested were *not* afflicting him—at least as severely—during the insured period. Henderson's explanations for the gap are hence not germane to his larger argument, and the Court finds no ground for reversal or remand in them.

### 3. Dr. Abu-Aita's Retrospective Diagnosis

Henderson's third and central argument is that the ALJ wrongly discounted Dr. Abu-Aita's retroactive diagnosis of multiple sclerosis. Retroactive diagnosis can be acceptable, and, indeed, it seems as if the ALJ considered Dr. Abu-Aita's assessment as just that. *See Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006). Henderson contends that the ALJ's decision is deficient in two

respects: first, Henderson argues that the ALJ erred in giving treating physician Dr. Abu-Aita's 2010 assessment of Henderson's RFC little weight. Second, and in the same vein, Henderson points out that the ALJ discounted every physician assessment in the record, including treating physician Dr. Abu-Aita and the reviewing physicians hired by the Commissioner. This, he contends, reveals that the ALJ was "playing doctor," which is not permitted. *See, e.g.*, *Clifford*, 227 F.3d at 870 ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record.").

Turning to the first point, "a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. 404.1527(d)(2); *Skarbek*, 390 F.3d at 503). But if, as here, an ALJ discounts a medical opinion because it is unsupported by, or inconsistent with, other medical evidence, all he must do is "minimally articulate" his reasons—"a very deferential standard that we have, in fact, deemed 'lax.'" *Id.* (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2006) (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004))).

The ALJ noted that, during the insured period, Henderson did not complain about dizziness, an unstable gait, or falling and that Dr. Abu-Aita observed that Henderson "walks well." (AR 30). He contrasted this with Dr. Abu-Aita's 2010 assessment, which asserted that Henderson was very limited in his ability to walk, stand, or sit. This led the ALJ to conclude that the earlier records and the 2010 assessment were inconsistent with each other. He decided that the treatment notes deserved greater weight because they were written contemporaneously with Henderson's visits. In doing this, the ALJ relied on medical evidence in the record about Henderson's limitations. This satisfies the

minimal explanation requirements and does not warrant remand.

Likewise, the second point—that the ALJ was playing doctor—also fails because the ALJ's decision was grounded in medical evidence not his own unsupported speculations. The ALJ thus was not "playing doctor" but making a necessary decision about conflicting evidence. *See Clifford*, 227 F.3d at 870. This does not warrant remand, either. The Court thus affirms this portion of the ALJ's decision.

### B. Credibility

Henderson also argues that the ALJ failed to support his finding that Henderson was not credible with evidence of record as required by SSR 96-7p and 20 C.F.R. § 404.1529. Reviewing courts accord a great deal of deference to ALJs on matters of credibility. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (quoting *Skarbek*, 390 F.3d at 504–05; *see also Prochaska*, 454 F.3d at 738.) Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009)). And the Court has greater freedom to review credibility decisions that rest on objective factors rather than those that are based on subjective factors such as the claimant's demeanor before the ALJ. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford*, 227 F.3d at 872).

Henderson first argues that the ALJ erred when he found Henderson's demyelinating disease/multiple sclerosis not severe prior to the date last insured. Henderson contends that this was an incorrect premise to begin the credibility determination with and that the ALJ was not able to

properly determine if Henderson's functional impairments were reasonably related to his underlying impairment. But as discussed above the ALJ's decision to weigh lightly Dr. Abu-Aita's 2010 assessment does not require reversal or remand. This argument fails for the same reasons.

Second, Henderson argues that the ALJ drew the wrong conclusion from Dr. Abu-Aita's August 2006 EMG. Henderson admits that the EMG revealed that he did not have active polyneuropathy, myelopathy, or radiculopathy. But he contends that Dr. Abu-Aita's diagnosis of possible *chronic* polyneuropathy, myelopathy, or radiculopathy shows that the ALJ's reached the wrong conclusion. The EMG, according to Henderson, actually *supports* Henderson's claim.

It is well established that "an ALJ need not address every piece of evidence in his decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citing *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). So, in the first place, Henderson makes no case for why this is such an important piece of evidence that the ALJ's decision not to address it warrants remand. Second, there is no reason to think Henderson's hoped-for conclusion is warranted by the evidence. There was only a *possibility* of chronic polyneuropathy, myelopathy, or radiculopathy. More significantly, there was no sign of active polyneuropathy, myelopathy, or radiculopathy and thus—presumably—no contemporaneous limitations resulting from it. This supports (or, at least, does not undermine) the ALJ's decision on this point. And, as the ALJ pointed out, this is further bolstered by the fact that Henderson was able to work full time while experiencing the same sort of symptoms. The Court concludes that the ALJ's decision not to address the possibility of chronic polyneuropathy, myelopathy, or radiculopathy does not warrant remand.

Next, Henderson turns to the ALJ's decision to discredit his complaints of lower extremity impairment prior to the date last insured because treatment records reveal that Henderson mentioned

numbness from the waist down but denied having any weakness in his legs or difficulty walking. This, Henderson asserts, is off the mark since the issue is not whether Henderson was immobilized or could not walk, but whether he was legally disabled. Henderson contends that he was suffering from these symptoms during the insured period (though not as badly as in 2009 and later) and that the ALJ should have believed him. This is a spurious argument. The ALJ did not discuss immobilization but whether the medical evidence supported the claims about symptom intensity and functional limitation. Since the ALJ supported his decision with ample and accurate citations to the record, the Court sees no reason to remand on this basis.

Henderson next challenges the ALJ's decision to discredit his testimony because he inconsistently took his medication. Henderson argues that this inference is unfair for three reasons: first, because he was allergic to steroids; second, because Celebrex and Lyrica did not work; and third, because even surgery would have not provided any relief.

There is some plausibility to Henderson's allegation that inconsistent medication usage was wrongly held against him, especially about steroids, to which he is allergic, and Lyrica, which medical records reveal was not working. The ALJ's decision on this point is cursory and mentions no specifics. But the discussion of inconsistent medication usage is a very small part of the ALJ's decision. And the decision can stand without that section and is not undermined by disregarding it. The Court accordingly finds that the ALJ's errors about Lyrica and steroids usage alone do not warrant remand.

Finally, Henderson alleges that the ALJ erred in questioning Henderson's credibility because he waited eight years to apply for disability. Plaintiff testified that he did not know that he could file for disability and expected his doctor to do it for him. The ALJ noted that, if Henderson's condition

caused his inability to work, it was reasonable to assume that he either would have applied for benefits sooner or would have had advised medical providers that he was unable to work, rather than saying he was retired.

ALJs do not have to believe everything a claimant says. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). And this Court, as mentioned above, will only overturn a credibility determination if it is "patently wrong." *Elder*, 529 F.3d at 413–14. Henderson argues that there are plausible reasons why the ALJ's interpretation is off the mark. But showing the ALJ picked one of several explanations for his behavior does falls short of showing that the ALJ's decision on this point was patently wrong. Remand is accordingly not warranted. In light of all this, the Court finds that the ALJ's credibility decision is not patently wrong or contrary to law and hence affirms it.

## V. Conclusion

For all the reasons laid out above, the Court finds that the Commissioner's decision to deny Henderson benefits is supported by substantial evidence and is not contrary to law. The Court hereby **AFFIRMS** the Commissioner's decision and **DENIES** the Complaint for Judicial Review [DE 1], and Plaintiff's Social Security Opening Brief [DE 17].

SO ORDERED this 31st day of March, 2014

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record